## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| THOMAS & KING, INC.<br>249 East Main Street<br>Lexington, KY 40507,<br><br>on behalf of itself and all others similarly situated,<br><br>                         Plaintiff,<br><br>       v.<br><br>KONINKLIJKE AHOLD N.V.<br>Piet Heinkade 167-173, 1019 GM<br>Amsterdam, The Netherlands,<br><br>U.S. FOODSERVICE, INC.<br>9755 Patuxent Woods Drive<br>Columbia, Maryland 21046,<br><br>GORDON REDGATE<br>859 Fairmount Ave.<br>Chatham, New Jersey, 07928,<br><br>and<br><br>BRADY SCHOFIELD<br>12 Gulf Shore Blvd. N.<br>Naples, Florida 34102,<br><br>                      Defendants. | Civil Action No. 07-608-DRH<br><br><br><br><br><br>**DEMAND FOR JURY TRIAL** |

## CLASS ACTION COMPLAINT

Plaintiff Thomas & King, Inc. ("T&K"), by and through its undersigned attorneys, based upon personal knowledge with respect to its own acts, and as to all other matters based upon the investigation of Plaintiff's counsel to date, hereby avers as follows:

## I.  Nature of the Complaint

1.      T&K brings this action for damages, disgorgement, restitution and injunctive relief on behalf of itself and all others similarly situated against Koninklijke Ahold N.V. ("Royal Ahold"), U.S. Foodservice, Inc. ("USF"), Gordon Redgate ("Redgate") and Brady Schofield ("Schofield") for violation of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961 *et seq.*, ("RICO"), fraudulent inducement, concealment and nondisclosure, breach of contract, unjust enrichment and constructive trust.

2.      As the second largest broadline foodservice distributor in the United States, USF provides food products and services to approximately 250,000 customers.  T&K and USF's other customers purchased food and other products from USF with the expectation that USF would act honestly and in a commercially reasonable manner.  This case arises out of Defendants' schemes to falsely inflate the prices USF charged to its customers since at least 2000 through the use of shell companies, sham transactions and phony invoices.  Defendants implemented their schemes on a nationwide scale, effectively stealing hundreds of millions of dollars from innocent customers across the country including thousands of hospitals and restaurants.  T&K, the 8th largest restaurant franchise company in the United States, brings this lawsuit to remedy Defendants' wrongful conduct and to recover the losses of T&K and of all others similarly situated, including treble and punitive damages.

3.      Under the schemes, USF, with the full knowledge, approval and participation of Royal Ahold, intentionally inflated the cost component (*i.e.*, "Landed Cost" or other similarly defined cost component) of the price it charged to its customers under contractual arrangements

2

defining this price in terms of a cost component plus a mark-up or distribution fee (*e.g.*, cost-plus or margin-on-sell contracts).  These contractual arrangements are hereinafter referred to as "cost-plus contracts."  USF hid the inflation through the use of shell companies.  USF set up these shell companies for the sole purpose of posing as middlemen in the food distribution chain.  USF also inflated the cost component by persuading certain suppliers to pay promotional allowances unrelated to any actual value provided.  Six of the shell companies, ostensibly owned by Defendants Redgate and Schofield, were called "Value Added Service Providers" ("VASPs").  They were so-called to hide and conceal from USF's customers their true purpose:  to pretend to buy and then re-sell food to USF at a higher "invoice cost."  USF then used the VASP transactions to calculate the cost component charged to USF's customers.  Over a period of several years, Defendants USF, Royal Ahold, Redgate and Schofield executed the VASP scheme to "purchase" almost $8.5 billion in products and overcharge USF's customers, including T&K, hundreds of millions of dollars.

4.      The existence of the VASPs was first disclosed to Royal Ahold shareholders in October 2003 as part of Royal Ahold's announcements that it would be restating its earnings for fiscal years 2000 and 2001 by more than $800 million after discovering accounting fraud at USF.  Royal Ahold's 2003 announcements led the SEC, DOJ and Netherlands authorities to launch parallel investigations into whether USF booked inflated and not yet earned "promotional allowances" from suppliers.

5.      As a result of those investigations, in October 2004, the SEC charged Royal Ahold and its top three executives—Cees van der Hoeven, CEO, A. Michiel Meurs, CFO, and Jan Andreae, EVP—with securities fraud.  The company and two former executives settled the charges on October 18, 2004.  Specifically, van der Hoeven and Meurs consented to orders

barring them from serving as officers or directors of a public company. Subsequently, in November 2005, Royal Ahold settled a U.S. shareholder class action for $1.1 billion, and in May 2006, Royal Ahold's former CEO and CFO were convicted of fraud in the Netherlands. Additionally, four former USF executives—Michael Resnick, CFO, Mark Kaiser, Chief Marketing Officer, Timothy Lee, EVP of Purchasing, and William Carter, VP of Purchasing, Supply Chain—have been convicted of, or pled guilty to, criminal charges arising from the accounting fraud. In July 2004, Lee and Carter pled guilty to criminal securities fraud and agreed to cooperate with investigators. Resnick later pled guilty to conspiracy to submit false books, records and accounts and received three years probation. On May 17, 2007, Kaiser was sentenced to seven years in prison. In addition to Royal Ahold, USF and their executives, approximately a dozen co-conspirators from USF's supplier companies have pled guilty to fraud, conspiracy and/or insider trading, including the two individual defendants in this matter— Schofield and Redgate.

6.     While the prior SEC and DOJ investigations and shareholder suits addressed and resolved important issues of public trust and harm to Royal Ahold's shareholders, those investigations failed to redress a more pernicious harm, the harm to USF's customers. Moreover, Royal Ahold actively tried to cover-up the effects of the schemes on USF's customers through misleading financial statements issued as part of "resolving" USF's accounting fraud. USF and Royal Ahold both profited from this cover-up. This action will provide redress for USF's customers.

4

## II. Jurisdiction and Venue

7.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1367, and 18 U.S.C. § 1964(c).  This Court also has jurisdiction pursuant to 28 U.S.C. § 1332(a), as the matter in controversy exceeds the sum or value of $75,000 and is between citizens of different states.  This Court also has jurisdiction over this class action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d), providing for jurisdiction where, as here, "any member of a class of plaintiffs is a citizen of a State different from any defendant" and the aggregated amount in controversy exceeds five million dollars ($5,000,000), exclusive of interests and costs.  *See* 28 U.S.C. §§ 1332(d)(2) and (6).

8.      Venue is proper in this district pursuant to 28 U.S.C. § 1391(b), 18 U.S.C. § 1965 and the letter agreement between T&K and USF's predecessor Alliant Foodservice, Inc. (the "T&K contract") which provides that "the parties each hereby submit to the venue of [the federal and/or state courts of Illinois]." *See* Letter from Alliant Foodservice, Inc. to Michael Scanlon, President & Chief Executive Officer, Thomas & King, Inc., ¶ 21 (July 17, 2001) (attached hereto as Exhibit 1).  A substantial part of the events giving rise to Plaintiff's claims occurred in this district, including many acts that were part of Defendants' unlawful conspiracy and their unlawful acts in furtherance thereof.  Further, the ends of justice require that Defendants be brought before this Court for the adjudication of Plaintiff's claims.

## III. Parties

9.      Plaintiff T&K is a corporation organized under the laws of the State of South Carolina, with its principal place of business at 249 East Main Street, Lexington, KY 40507.

10.     Founded in 1988, T&K owns and operates eighty-eight Applebee's Neighborhood Grill & Bar restaurants and seven Carino's Italian Grill restaurants in Arizona, Indiana, Kentucky, Ohio and Pennsylvania.

11.     Defendant Royal Ahold is a public holding company in The Netherlands with its principal place of business at Piet Heinkade 167 – 173, 1019 GM, Amsterdam, The Netherlands. As a part of its operations, Royal Ahold owns and operates grocery stores and food service companies in the United States and Europe through subsidiaries and affiliates.  Royal Ahold's companies generated more than 44 billion euros in their fiscal year 2006.

12.     Defendant USF is a corporation organized under the laws of the State of Delaware, with its principal place of business at 9755 Patuxent Woods Drive, Columbia, Maryland 21046.

13.     Before it was purchased by Royal Ahold in April 2000, USF's stock was publicly traded on the New York Stock Exchange.  In late 2001, Royal Ahold entered into an agreement through its subsidiary, USF, to acquire all outstanding shares of Alliant Exchange, Inc., the parent company of Alliant Foodservice, Inc. ("Alliant").

14.     Defendant Brady Schofield is an individual who, upon information and belief, resides in Naples, Florida.  During the relevant period, Schofield was president and, upon information and belief, the principal owner of the following corporations:  (1) Frozen Farms, Inc., (2) Produce Solutions, Inc., (3) Seafood Marketing Specialties, Inc., and (4) Specialty Supply & Marketing, Inc.

15.     Defendant Gordon Redgate is an individual who, upon information and belief, resides in Chatham, New Jersey.  During the relevant period, Redgate was president and, upon information and belief, the principal owner of the following corporations:  (1) Commodity Management Systems, Inc. and (2) Private Label Distribution, Inc.

## IV. Other Entities

16.     Frozen Farms, Inc. ("Frozen Farms") was a corporation organized under the laws of the state of Rhode Island, with its principal place of business in Middletown, Rhode Island. Frozen Farms purportedly transacted in frozen and processed foods.

17.     Produce Solutions, Inc. ("Produce Solutions"), upon information and belief, was a corporation organized under the laws of the state of Rhode Island, with its principal place of business in Newport, Rhode Island. Produce Solutions purportedly transacted in produce.

18.     Seafood Marketing Specialists, Inc. ("Seafood Marketing Specialists") is a corporation organized under the laws of the State of Rhode Island, with its principal place of business in Middletown, Rhode Island. Seafood Marketing Specialists purportedly transacted in seafood products.

19.     Specialty Supply & Marketing, Inc. ("Specialty Supply & Marketing") was a corporation organized under the laws of the State of Rhode Island, with its principal place of business in New Bedford, Massachusetts. Specialty Supply & Marketing purportedly provided sales support.

20.     Commodity Management Systems, Inc. ("Commodity Management") is a corporation organized under the laws of the State of New Jersey, with its principal place of business in Chatham, New Jersey. Commodity Management purportedly transacted in frozen fruits and vegetables.

21.     Private Label Distribution, Inc. ("Private Brands") was a corporation organized under the laws of the State of New Jersey, with its principal place of business in Summit, New Jersey. Private Brands purportedly transacted in canned food products.

## V.  Class Allegations

22.     Plaintiff brings this suit as a class action pursuant to Federal Rules of Civil Procedure 23(a), (b)(2) and (b)(3), on its behalf and as representative of the following class of persons and entities ("the Class"):

> Any person in the United States who purchased products from USF pursuant to contractual arrangements in which the price paid was defined in terms of a cost component plus a mark-up, and for which USF used a VASP transaction to calculate the cost component.  Excluded from the Class are USF, USF's parent company, Royal Ahold, any other Royal Ahold or USF subsidiary or affiliate, as well as any entity controlled by Royal Ahold or USF.

23.     The members of the Class are so numerous that separate joinder of all Class members is impracticable pursuant to Rule 23(a) of the Federal Rules of Civil Procedure. Although the exact number of class members is not yet known, on information and belief, USF has tens of thousands of customers who bought products pursuant to cost-plus contracts and thus who were overcharged as described herein.  These customers are geographically dispersed throughout the United States.

24.     Questions of law or fact common to Plaintiff's claims and those of the Class predominate over any question of law or fact affecting only individual members of the Class. Questions of law and fact common to the Class include, *inter alia*, the following:

    a.     Whether USF engaged in the fraudulent schemes or artifices described herein;

    b.     Whether USF, together with Frozen Farms, Produce Solutions, Seafood Marketing Specialists, Specialty Supply & Marketing, Commodity Management, and Private Brands formed an association-in-fact enterprise (the "VASP Enterprise" as defined below) for the purpose of carrying out Defendants' scheme;

    c.     Whether Private Brands, Commodity Management, Frozen Farms, Produce Solutions, Seafood Marketing Specialists, and Specialty Supply & Marketing each constitute a separate enterprise (the "Individual VASP

Enterprises" as defined below) for the purpose of carrying out Defendants'
scheme;

d.   Whether RICO Defendants USF, Royal Ahold, Redgate and Schofield
were associated with the alleged enterprises to conduct or participate,
directly or indirectly, in the affairs of an enterprise through a pattern of
racketeering activity in violation of 18 U.S.C. § 1962(c);

e.   Whether RICO Defendants USF, Royal Ahold, Redgate and Schofield
engaged in a pattern of racketeering activity with the intent to defraud
Plaintiff and the Class using the U.S. mails and interstate wire service in
violation of 18 U.S.C. §§ 1341 and 1343 (mail and wire fraud);

f.   Whether RICO Defendants USF, Royal Ahold, Redgate and Schofield
engaged in a pattern of racketeering activity to hide, conceal and promote
their scheme by laundering monetary instruments or engaging in monetary
transactions involving criminally derived property in violation of 18
U.S.C. §§ 1956 and 1957;

g.   Whether RICO Defendants USF, Royal Ahold, Redgate and Schofield
conspired to violate 18 U.S.C. § 1962(c) as prohibited by 18 U.S.C.
§ 1962(d);

h.   Whether USF's practices constituted a breach of its cost-plus contractual
arrangements with its customers;

i.   Whether USF's practices unjustly enriched Royal Ahold when it accepted
and retained the proceeds of the falsely inflated invoices; and

j.   Whether a constructive trust should be imposed on all the property Royal
Ahold acquired as a result of Defendants' schemes.

25.   Plaintiff's claims are typical of the Class' claims because Plaintiff and other Class

members purchased products from USF under cost-plus contractual arrangements at a price that

USF unlawfully inflated through its schemes or artifices to defraud, including USF's use of

VASPs to create false and inflated invoice costs used to calculate the cost component of the price

charged to USF's customers.

26.   As Class Representative, T&K will fairly and adequately protect the interests of

the Class, and to that end has engaged counsel experienced in both class actions and other

complex litigation including federal RICO claims; T&K has no interests antagonistic to, or in conflict with, the Class it seeks to represent; and T&K will vigorously prosecute the claims of the Class through qualified and experienced counsel.

27.     Class representation is superior to other available methods for the fair and efficient adjudication of the controversy asserted herein because of the many questions of law and fact that are common to Plaintiff's claims and those of the Class.  Any possible issues applicable to individual class members that may exist in managing this class action are greatly outweighed by the advantages of class treatment, particularly given the impact of the schemes across USF's broad customer base and the schemes' specific design to be implemented market-wide and operated in a manner to affect all USF's customers with cost-plus contractual arrangements.

28.     Class treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without unnecessarily duplicating evidence, effort, and expense that numerous individual actions would engender.  The advantages of class treatment include providing a method for redressing these claims that otherwise might not warrant individual litigation.  A class action also eliminates the potential for inconsistent adjudication of multiple individual claims.

## VI. Factual Background

### A.     The Nature of USF's Business

29.     USF is the second largest broadline foodservice distributor in the United States based on 2006 net sales.  USF provides its products and services to approximately 250,000 customers.

30.     As part of its business operations, USF purchases food and related products from food manufacturers and other suppliers and then markets, sells and delivers those products to

10

chain restaurants, independent restaurants, and healthcare, hospitality, government and educational facilities across the United States.

31.     When distributing food and related products, USF typically enters into a cost-plus arrangement with its customers.  Under these contractual arrangements, USF agrees to charge its customer a price based on a cost component plus a mark-up of either a fixed percentage or a set dollar amount which is added on to the cost component of the agreement.  The cost component that serves as USF's basis for the mark-up is typically referred to as "Landed Cost."

32.     Moreover, USF's cost-plus contractual arrangements allow the price charged to USF's customers to not account for the amount of promotional allowances paid by a supplier to USF.

33.     Promotional allowances are rebates, discounts, credits or similar consideration that suppliers provide to customers to promote the sale of their goods.

34.     Promotional allowances can take various forms including signing bonuses, volume-based programs, seasonal programs, growth programs, corporate marketing allowances, and local marketing funds and food shows.

35.     In some cases, suppliers pay a distributor a fixed sum of money up-front to encourage the distributor to carry or promote only that supplier's brands.  Another type of allowance is known as a growth program under which a supplier agrees to rebate a percentage of the product's price to the distributor if the distributor increases sales of a given product over a specified period of time.

36.     A promotional allowance reduces the price the distributor pays to acquire a product that it intends to re-sell.  Correspondingly, the promotional allowance paid by the supplier to the distributor reduces the supplier's profit margin.

37.     Distributors often refer to promotional allowances as "sheltered income" because they do not appear on the distributor's purchase orders or invoices received from the supplier.

**B.     Defendants' Schemes to Defraud**

38.     Defendants designed and executed schemes to defraud their customers, including T&K, by falsely inflating the cost component of the price charged to their cost-plus customers. Typically, the schemes took one of two forms.

**The VASP Scheme**

39.     One scheme involved creating and controlling fictitious middleman companies between USF and the food supplier. Defendants misleadingly called six of these middlemen Value Added Service Providers to suggest that they added some economic value to the distribution chain.

40.     Simply put, USF falsely inflated the cost component it charged to its customers, and USF used the VASPs to conceal these overcharges from its customers. In many cases, USF negotiated a purchase price for products from suppliers, directed the VASPs to "purchase" those products at that negotiated price, funded the "purchase," and then directed the VASPs to "resell" the same products at a falsely inflated price to USF. USF would then use the falsely inflated price to calculate the cost component it charged to its customers. At the same time, USF would direct the VASPs to kick back to USF the difference between the falsely inflated price the VASPs "charged" USF for the product and the original price USF negotiated with the suppliers, less a minimal "transaction fee."

41.     In reality, the VASPs had no legitimate or commercially reasonable business purpose. Instead, they served only as vehicles to falsely increase the cost component of the price

charged to USF's customers and to generate a bogus paper trail that would conceal USF's illegal conduct from its customers.

42.     Although independently owned, USF effectively controlled the VASPs and directed their business on a daily basis.  VASP related transactions with USF accounted for almost one-fifth of all of USF's purchases.  In fact, Royal Ahold stated in its fiscal year 2002 Form 20-F, filed on October 16, 2003, that the VASPs' "sales" to USF during the period from 2000 to 2003 totaled approximately eight billion euros and that these sales included primarily private label and signature brand products.

43.     In its 2004 Form 20-F, filed on April 14, 2005, Royal Ahold further disclosed an additional four hundred and eighty nine million euros in VASP "sales" to USF, and stated that USF ended its relationship with five of the VASPs through a phased transition of services.

44.     USF and Royal Ahold funded the VASPs' operations through interest-free advances and financial guarantees and 100% of the VASPs' shares were assigned and irrevocably transferred to USF as collateral for these advances.

45.     Indeed, the VASPs were not provided with any owner-supplied funding whatsoever and the "transaction fees" paid to the VASPs were intentionally structured to enable the VASPs to "break even."

46.     Defendants Schofield and Redgate knew each other and were in frequent contact. In fact, Schofield, Redgate and a USF executive who supervised the fraudulent VASP scheme on a day-to-day basis, were sometimes referred to around USF's offices as "the Three Musketeers."

47.     Royal Ahold, Redgate and Schofield all had knowledge of, and willingly participated in, the orchestrated scheme to use the VASPs to falsely inflate the invoice cost used to calculate the cost component so that they could in turn defraud USF's customers.

Furthermore, Redgate had knowledge that USF was buying certain categories of food products through Schofield's VASPs and Schofield had knowledge that USF was buying other types of food products through Redgate's VASPs.

48.    For example, Defendant Redgate created Private Brands, one of the VASPs, at the request of USF. The purpose for establishing Private Brands was to create an entity to put a "spread" on the goods that USF sold to its customers.

49.    Private Brands did not negotiate contracts with the suppliers, USF did. Private Brands only placed orders that USF instructed it to place, from the suppliers USF told it to order from, at a price negotiated directly between the supplier and USF.

50.    Upon information and belief, Private Brands did not take possession of the food and related products it ordered at USF's direction. Nor did Private Brands have sufficient funds to pay for the products it ordered without interest-free loans from USF.

51.    Under the VASP scheme, USF would negotiate a price directly with a supplier. For example, USF would negotiate a price directly with the supplier for $10 a case for whole kernel cut corn. Then USF would place an order with Private Brands which would, in turn, place the order for the corn with the supplier for the price of $10 a case. Private Brands would pretend to re-sell the corn to USF for $14. Accordingly, Private Brands would bill USF $14 for the case of corn.

52.    The $4 that Private Brands increased the price of the corn above the price USF negotiated with the corn supplier was called a "bucket." After USF paid Private Brands the $14, Private Brands would kick-back the "bucket," *i.e.*, the difference between the $14 and USF's previously negotiated price of $10, or $4, directly to USF minus a small pre-determined transaction fee for each invoice.

14

53.     In some cases, the corn supplier would also agree to provide an unearned promotional allowance. During the early days of the scheme, the supplier would first pay the promotional allowance to Private Brands and Private Brands would forward the promotional allowance to USF (in addition to the $4 "bucket"). Later, USF directed the supplier to pay the unearned promotional allowance on transactions funneled through Private Brands directly to USF.

54.     USF would then calculate the cost component used to bill its customers using the $14 from the Private Brands transaction. On information and belief, USF would book the $4 "bucket" in its accounting records as if it represented an earned, commercially reasonable promotional allowance paid by a supplier.

55.     However, the $4 added by Private Brands to the cost of the corn in the above example was not an earned promotional allowance or other commercially reasonable rebate. Private Brands was not a real supplier. It was merely a straw-man posing as a supplier.

56.     The "buckets" of money sent from the VASPs to USF thus were structured to look like honestly earned and commercially reasonable rebates or promotional allowances when in fact they were not. The bucket payments also were designed to hide from USF's customers the "cost" falsely added by the scheme to USF's invoices.

57.     USF deceived its customers into believing that USF's cost component was calculated based on using transactions with only legitimate suppliers. The scheme was designed to, and did, induce USF's customers to rely on USF's material representations, enter into contracts with USF, place orders for products from USF, and make payments to USF. Moreover, such reliance was reasonable under the circumstances because Defendants intentionally used the

15

VASPs to hide the scheme from USF's customers and concealed from, and at no time fully disclosed to, USF's customers the existence and true purpose of the VASPs.

58.     Another company owned by Defendant Redgate, Commodity Management, was used in the same way that USF controlled and operated Private Brands.

59.     On information and belief, four companies owned by Defendant Schofield were also set up at USF's direction and operated like Private Brands as VASPs. Those companies were Frozen Farms, Produce Solutions, Seafood Marketing Specialists, and Specialty Supply & Marketing. They were all similar to Private Brands in that they were set up at USF's direction to falsely create a spread on the cost of products USF sold to its customers.

60.     Upon information and belief, each VASP operated in a substantially similar manner throughout the relevant period.

### 2.     Commercially Unreasonable Promotional Allowances

61.     Under another scheme, USF would enter into an agreement with a supplier under which the supplier would agree to a price for the sale of the goods. Thereafter, the supplier would agree to issue an invoice to USF with a price higher than the supplier otherwise would have charged to USF, while at the same time agreeing to give USF a higher and off-setting unearned promotional allowance.

62.     As an example, a supplier's regular price for an item might be $1.20 and under normal circumstances the supplier would give the distributor an earned 20 cent promotional allowance, thus accepting a price of $1.00. In that instance, USF's invoice cost, the cost used to calculate the cost component billed to its customers and on which its mark-up would be added, would be $1.20.

63.     Under USF's scheme, however, USF would persuade the supplier to invoice USF $1.40 and then rebate 40 cents to USF which would include the normal earned 20 cent promotional allowance and another 20 cents that was unrelated to any earned promotional allowances or rebates.  Under the scheme, thus, the invoice cost used to calculate the cost component would be $1.40 – rather than $1.20 – even though the supplier's net price was the same as it would have been in the absence of the scheme.

64.     In fact, however, the falsely inflated 20 cent payment to USF represented an amount that would otherwise not have been offered as a promotional allowance and exceeded the amount of promotional allowance the supplier was otherwise willing to pay.  That additional 20 cent payment was not a commercially reasonable promotional allowance paid by the supplier or earned by USF.

65.     The effect of the scheme was also to allow USF to overcharge its customers by enabling USF to compute the cost-plus price charged to its customers based on a falsely inflated cost component.

**C.     T&K's Contracts with USF and T&K's USF Purchases**

66.     Effective July 1, 2001, T&K and USF's predecessor Alliant entered into the T&K contract.  This contract was in effect until either party elected to terminate it.

67.     Over a two and a half year period, from 2001 to 2004, T&K spent approximately $104.6 million on food-related products purchased from USF pursuant to the T&K contract.

68.     Shortly after USF acquired Alliant, USF converted T&K from purchasing Alliant products to USF private label and signature brand products, many of which were purchased through the VASPs.  On information and belief, T&K purchased USF private label and signature brand products including U.S. Blue, Glenview Farms, Harvest Value, and Monogram products.

17

69.     The T&K contract required USF to bill T&K a price equal to a cost component plus a distribution fee or mark-up. The distribution fee was expressed as a percentage or as a fixed dollar amount. The price charged to T&K was to equal the cost component plus the agreed on mark-up less any promotional allowance exclusively negotiated by, or on behalf of, T&K.

70.     For many products, the price listed on the invoice issued by USF's vendors or other similar types of entities was to be used in calculating the cost component.

**D.     USF's Pattern of Defrauding T&K and other Class Members**

71.     USF's dummy sales dealings with the VASPs and its falsely inflated promotional allowances with suppliers were self-contained schemes that operated independently from any single contract with T&K or USF's other customers. USF's schemes were not specifically designed to defraud only T&K, but rather represented a systematic way of doing business that was independent of any particular contract or specific customer.

72.     On information and belief, between 2000 and 2004, USF engaged in thousands of separate fraudulent transactions in furtherance of its schemes to falsely inflate the cost component of the price charged to its customers. Details regarding the dates, times, products purchased, and the amount of the false spread added by the VASPs, which occurred on a daily basis for a period of several years from at least 2000 until 2004, remain in the exclusive control of Defendants.

73.     USF's schemes to defraud its customers by falsely inflating the cost component of the price were further concealed under the guise of complying with the terms of its cost-plus contractual arrangements. USF utilized the VASPs and the other methods of deception described above to falsely inflate the cost component of the price charged to USF's customers since at least 2000, and continued to operate the schemes, as described above, at least until 2004. Since at

18

least 2000, USF has repeatedly and regularly conducted the schemes described above for the specific purpose of obtaining money or property that rightfully belongs to its customers.

### E.      Royal Ahold's Participation in the Schemes

74.      Prior to, and as part of, its acquisition of USF, Royal Ahold was aware of weaknesses in USF's ability to track promotional allowances and a lack of an internal control system.

75.      Prior to, and as part of, its acquisition of USF, Royal Ahold was aware that the VASPs' purpose was to "shelter and earn similar 'rebates' on [USF's] private label brands and to hide PA's [promotional allowances] from clients' auditors." *See* PricewaterhouseCoopers Report on U.S. Foodservice, Ex. 2 (June 25, 2003).

76.      In fact, on or about February 20, 2000, an email memorandum about the existence and purpose of the VASPs was sent by Royal Ahold's Vice President of Internal Audits, Paul Ekelschot, to Royal Ahold executives Cees van der Hoeven (Royal Ahold CEO), Michiel Meurs (Royal Ahold CFO), Jan Andreae (Royal Ahold Executive Board Member), Allan Noddle (Royal Ahold Executive Board Member), Robert Tobin (Royal Ahold Executive Board Member), Ton van Tielraden (Royal Ahold Senior Vice-President Legal Affairs and General Counsel), Andre Buitenhuis (Royal Ahold Senior Vice President Finance and Fiscal Affairs), Bert Verhelst (Royal Ahold Senior Vice-President Administration), Ernie Smith (Royal Ahold USA CFO), Carol Greczner (Royal Ahold USA Senior Vice-President Audit), and David Herskovits (Deloitte Auditor). *See* E-mail from Paul Ekelschot to Cees van der Hoeven, *et al.* (Feb. 20, 2000) (attached hereto as Exhibit 2). None of these board members are currently serving at Royal Ahold.

77.    Moreover, in 2001, USF's president and Chief Executive Officer since 1997, Jim Miller, was appointed to the Royal Ahold Corporate Executive Board.

78.    In addition to its full knowledge about the existence and purpose for the VASPs, Royal Ahold guaranteed certain obligations of the VASPs relating to purchases made on behalf of USF.  As of December 29, 2002, those guarantees totaled approximately 221 million euros. On information and belief, Royal Ahold used financial institutions, the mails and/or the wires, as specified below, in providing such guarantees.

79.    Thus, Royal Ahold was aware of the true nature and purpose of the VASPs and knowingly provided financial guarantees to the VASPs to aid USF in carrying out its VASP scheme.

80.    Royal Ahold continued to provide these guarantees after receiving a memorandum on April 12, 2001, from former USF CFO Ernie Smith, that stated that the VASPs "allow them to establish pads to income." *See* Memorandum from Ernie Smith to Michiel Meurs (Apr. 12, 2001) (attached hereto as Exhibit 3).

81.    Royal Ahold's guarantees furthered the operation of the enterprises alleged herein and Royal Ahold participated with USF in continuing, executing, profiting from and concealing the VASP scheme.

82.    As part of such participation, Royal Ahold sought and obtained a legal opinion in or around 2000 about the operation of the VASP scheme which was later withdrawn as improvidently provided.  At a minimum, this legal opinion was designed to further, and did conceal the VASP scheme from USF's customers.